UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
COURT FILE NUMBER 13-CV-956 (DSD/JJK)

_____

Sarah McIvor,

        Plaintiff,

v.

Credit Control Services, Inc., dba
Credit Collection Services and
TransUnion, LLC,

        Defendants.

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

_____

    Defendant Credit Control Services, Inc., dba Credit Collection Services' ("CCS") concedes in its Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment that it communicated Plaintiff Sarah McIvor's disputed credit information to Trans Union, LLC ("Trans Union") on or about April 12, 2013, without also communicating that the disputed debt was disputed as required by 15 U.S.C. § 1692e(8) of the Fair Debt Collection Practices Act (FDCPA) until its next reporting cycle on April 17, 2013. CCS also demonstrates by affidavit that its failure to comply with federal law was not the result of "procedures recently adapted to avoid such error" but rather the

expected outcome of procedures not in compliance with the law.

**I.     CCS' standard procedure for reporting consumer disputes does not comply with the FDCPA.**

The FDCPA requires CCS to "communicate that a disputed debt is disputed" in all communications regarding disputed debts. 15 U.S.C. § 1692e(8). This means "that, if a debt collector elects to communicate 'credit information' about a consumer, it must not omit a piece of information that is always material, namely, that the consumer has disputed a particular debt." *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 418 (8th Cir. 2008). CCS' Memorandum and accompanying affidavit reveal that its standard procedure for replying to consumer disputes does not comply with this statute:

> 9.     On or about April 12, 2013, CCS electronically processed a dispute of the plaintiff's debt that CCS received from Trans Union through e-Oscar (the credit bureau's online dispute mechanism). CCS electronically responded to plaintiff's e-Oscar dispute using the e-Oscar system on April 12, 2013, or shortly thereafter.

> 10.     In accordance with its policies and procedures, upon receiving plaintiff's e-Oscar dispute, CCS updated its own electronic database to reflect that the debt was disputed.

> 11.     On April 17, 2013, as part of CCS's next reporting cycle, CCS reported to Trans Union that the plaintiff's debt was disputed. A true and correct copy of this report is attached as Exhibit 1.

    12.    CCS believed it was inherent in its response to the e-Oscar dispute plaintiff lodged with Trans Union that plaintiff disputed the debt, and that the credit bureaus would therefore know that the debt was disputed. If there was no dispute by plaintiff, CCS would not have had anything to respond to.

    13.    CCS also believed that the credit bureaus, including Trans Union, similar to CCS's policy and procedure, would flag the plaintiff's debt as disputed in their own data systems upon receiving plaintiff's e-Oscar dispute and CCS's responses thereto.

Stoddard Aff. ¶¶ 9-11.

CCS designed this procedure to "avoid unnecessary delays." *Id*. at ¶ 7. Under this system, CCS's first response to the credit reporting agency (in this case made "on or about April 12") reflexively updates the debt information with "new information" *without* noting the dispute. Compl. Ex. B; Stoddard Aff. ¶ 9. It then marks the dispute during its next regular reporting cycle (in this case made "on April 17"). Stoddard Aff. ¶ 11. This systematically creates a time lag between the update made in response to the dispute (April 12) and the regular "batch" update (April 17), during which time the consumer's disputed credit information has been updated by CCS but contains no mention of the dispute. McIvor's Trans Union credit report sent to her in response to CCS' April 12, 2013 update (Compl. Ex. C), confirms that CCS did not note the dispute in its April 12 communication as required by § 1692e(8). This procedure does not comply with § 1692e(8), which

according to the 8th Circuit, requires "that, if a debt collector elects to communicate 'credit information' about a consumer, it must not omit a piece of information that is always material, namely, that the consumer has disputed a particular debt." *Wilhelm*, 519 F.3d at 418. Per CCS' own procedure, its first update always omits any reference to a dispute.

## II.     CCS' error was not exempted as "bona fide" under § 1692k(c).

"The bona fide error defense exists as an exception to the strict liability imposed upon debt collectors by the FDCPA."  *Picht v. Hawks*, 236 F.3d 446, 451 (8th Cir. 2001). The exception only applies "if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c). Such an exemption requires that 1) the error was unintentional, 2) the debt collector maintains procedures reasonably adapted to avoid the error, and 3) the error occurred in spite of these procedures.

While the intent of CCS is a factual question reserved for future discovery, CCS' error was not made "notwithstanding . . . procedures reasonably adapted to avoid any such error," and so is not exempted behavior. The violation occurred

as the direct result of CCS's systematic procedures, which create a dispute reporting gap and guarantees it will violate § 1692e(8) in its updates. 15 U.S.C. § 1692k(c). Even if unintentional, its procedures were not reasonably adapted to comply with the FDCPA, and its reporting mistake did not occur in *spite* of its procedures but *as a direct result* of them. As such it may not escape liability under the "bona fide error" exemption of § 1692k(c). CCS also may not argue that it mistakenly believed its procedure complied with § 1692e(8), but "bona fide errors in 1692k(c) do not include mistaken interpretations of the FDCPA . . . ." *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich*, 130 S. Ct. 1605, 1614 (2010). CCS also cannot read into the law a new exemption that it need not comply with the FDCPA when it believes compliance unnecessary:

> 12.    CCS believed it was inherent in its response to the e-Oscar dispute plaintiff lodged with Trans Union that plaintiff disputed the debt, and that the credit bureaus would therefore know that the debt was disputed. If there was no dispute by plaintiff, CCS would not have had anything to respond to.
>
> 13. CCS also believed that the credit bureaus, including Trans Union, similar to CCS's policy and procedure, would flag the plaintiff's debt as disputed in their own data systems upon receiving plaintiff's e-Oscar dispute and CCS's responses thereto.

Stoddard Aff. ¶ 12-13. If CCS believed that its failure to report the dispute would not have consequences, it was wrong. Trans Union's report shows that without

CCS marking a dispute, the dispute does not register. Compl. Ex. C. CCS's sending a report of the dispute to Trans Union on April 17 further contradicts this position that dispute reporting is unnecessary. If CCS knew it could rely on Trans Union's knowledge of the dispute to avoid reporting the debt as disputed, it would not have needed to relay to Trans Union that same information five days later, or at any future time.

## CONCLUSION

Because CCS's dispute reporting procedure does not comply with the FDCPA, it cannot argue that it violated § 1692e(8) despite procedures reasonably adapted to avoid any such error.  In fact, it appears the violation of § 1692e(8) occurred specifically because of its standard procedures. CCS concedes all facts supporting this in its memorandum and supporting affidavit. The Court justly should grant McIvor's motion for summary judgment.

Respectfully submitted,

Dated: 10/11/13         /s/ *Bennett Hartz*
Jonathan L. R. Drewes (#387327)
Bennett Hartz (#393136)
DREWES LAW, PLLC
1516 West Lake Street, Ste 300
Minneapolis, MN 55408
T (612) 285-3064
F (612) 285-3062
bennett@dreweslaw.com
*Attorneys for Consumer*